Na'eem NUMAN v. STATE of Arkansas

CR 86-141 722 S.W.2d 276

Supreme Court of Arkansas
Opinion delivered January 12, 1987

*Steve Kirk,* for appellant.

*Steve Clark,* Att'y Gen., by: *Lee Taylor Franke,* Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Appellant was charged in one information with three counts of burglary and in another information with one count of auto theft. In a consolidated trial, the jury found appellant guilty on all four counts. We affirm all four convictions.

Appellant attempted to plead guilty to one of the three burglary charges, but the State objected and demanded a jury trial. The trial court held that the State was entitled to a jury trial. The appellant asks us to reverse this conviction and remand for him to plead guilty because, he argues, he had a right to plead guilty. We decline to reverse the conviction.

Under the Constitution of the United States a criminal defendant does not have an absolute right to have a guilty plea accepted, *Lynch* v. *Overholser,* 369 U.S. 705, 719 (1962), but a state may confer such a right by statute or rule. In Arkansas, we have no such statute or rule and, accordingly, a defendant does not have a right to plead guilty.

In its brief, the State cites *Ruiz* v. *State,* 275 Ark. 410, 630 S.W.2d 44 (1982), *Hayes* v. *State,* 280 Ark. 509, 660 S.W.2d 648 (1983), and *Fretwell* v. *State,* 289 Ark. 91, 708 S.W.2d 630 (1986), as precedent for the rule that a criminal defendant does not have an absolute right to plead guilty. Those cases are not authority in the case at bar because they are capital felony cases and are specifically governed by A.R.Cr.P. Rule 31.4. The case at bar is not a capital felony case and is not governed by that same rule.

■ Appellant's second point of appeal is that his fifth and fourteenth amendment rights were violated when he was asked on cross-examination about his post-arrest silence. In *Doyle* v. *Ohio*, 426 U.S. 610 (1976), the Supreme Court of the United States held that questioning a defendant about his silence during and after receiving *Miranda* warnings violated the due process clause of the fourteenth amendment. The Court reasoned:

> [W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

However, in the concluding paragraph of its opinion, the Court left open the possibility that in some cases questioning about post-arrest silence could constitute harmless error.

The foundation for the harmless error rule in cases involving federal constitutional rights is *Chapman* v. *California*, 386 U.S. 18 (1967). There, the Court held that there may be some constitutional errors which are harmless, and do not require reversal, but the rule for such a doctrine would necessarily be a federal rule, and not various rules fashioned by the several states. The Court then wrote:

> In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one.
>
> . . .
>
> We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy* v. *Connecticut*, 375 U.S. 85. There we said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

. . .

■ We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case.

*Chapman, supra*, at 22, 23, & 24.

Since *Doyle* we have had the opportunity to consider applying the *Chapman* harmless error rule to various fact situations involving a comment on post-arrest silence.

In *Ward* v. *State*, 272 Ark. 99, 612 S.W.2d 118 (1981), the violation of the *Doyle* post-arrest silence doctrine was so egregious that it could not be harmless, so we did not even consider applying the *Chapman* rule. There, the defendant filed a threshold motion to prevent the State from arguing about the defendant's post-arrest silence. The motion was overruled. The defendant took the stand and was questioned about his post-arrest silence. Finally, the prosecuting attorney in closing argument commented on the defendant's post-arrest refusal to talk to the police by saying:

> Mr. Ward didn't want to talk about the matter. He wanted to talk about his lawyers. He knew he was in trouble. No, he wasn't going to tell them.

> No, huh-uh, and there is a very good reason for that because he done wrong. He done wrong, and he knew he had done wrong.

Similarly, in *Thompson* v. *State*, 284 Ark. 403, 682 S.W.2d 742 (1985), the violation of the *Doyle* post-arrest silence doctrine was so flagrant that it could not be considered a harmless error. There, the defendant refused to give a statement to the police and then, at trial, gave an exculpatory version of facts. Cross-examination was as follows:

[PROSECUTING ATTORNEY]

Q: Did you tell the police officer? Did you tell anyone else about being beaten?

[DEFENSE ATTORNEY]

Objection, Your Honor. She was taken into custody and is not required to make any statement after that.

THE COURT:

The objection is overruled, sir.

Q: Did you tell the police officers that you had been beaten and kicked and stomped by Ms. English?

A. I don't believe I did.

Q: So this is the first time you've told anybody outside your counsel who is here today. Is that correct?

A: I didn't know I had to tell the policeman that.

Q: No, I just asked you if you did.

A: I said I didn't.

During closing argument the prosecutor highlighted the questions, over the objection of the defendant, by arguing that the discrepancy between the exculpatory story given at trial and the silence at and after the time of arrest gave rise to an inference that the story was recently fabricated.

On the other hand, the violation of the *Doyle* doctrine was slight in *Hobbs* v. *State*, 277 Ark. 271, 641 S.W.2d 9 (1982). There the colloquy was as follows:

Q: Did Mr. Hobbs [defendant] make a voluntary statement to Captain Wilson on that date?

A: Yes, he did.

Q: Do you recall what he told Captain Wilson?

A: He told Captain Wilson that Cub Peel had something to do with the death of Marsha Bonds, and that — Gary asked him about his car. He said his car broke down somewhere around Texarkana. After that, he made the statement about Cub Peel. Then, he said, 'I don't want to say anymore, until after I talk to my lawyer.'

After the witness testified that the defendant said that he wanted an attorney before saying anything further, the defendant objected and moved for a mistrial. The court declined to grant a mistrial but instructed the jury to disregard, and give no consideration to, the statement that the defendant wanted to talk to an attorney. No further questions on the subject were asked, and the prosecutor did not mention the matter in closing argument.

Since that case did not present a prosecutorial focus on the defendant's silence by repeated questions or closing argument, and was not so egregious as to automatically cause harm, we weighed the error against the evidence of guilt. We held that the error was harmless in comparison to the overwhelming evidence of guilt. The Eighth Circuit Court of Appeals weighed the error in the same manner and reached the same result. *Hobbs* v. *Lockhart*, 791 F.2d 125 (8th Cir. 1986).

In the case at bar the error was not egregious; there was only one question without an answer. It was:

[PROSECUTING ATTORNEY]
Q: Did you ever tell anyone with the Sheriff's office of Conway County, the State Police, the City Police or anyone else, up until today, anything about this Jessie Clark being the one that broke into the Harwood house?

A: Uh, some. . .

[APPELLANT'S ATTORNEY]
Your honor, may we approach the bench?

An objection was then made and a mistrial was asked. The trial court declined to grant a mistrial and instructed the prosecutor not to ask any more questions on the subject. The trial court did not instruct the jury to disregard the question, probably because appellant's attorney did not request it. The subject was never mentioned again.

A preliminary analysis of the improper question reveals that it concerns only one of the four convictions, the conviction for the burglary of the Harwood home. It does not touch upon the convictions for the other two burglaries, or upon the car theft. Thus, the error was committed only in the one conviction, the Harwood burglary. Accordingly, we affirm the convictions for the other two burglaries and the car theft without further discussion.

We need only weigh the error in the Harwood burglary.

The question about the Harwood burglary was not answered, nor was there repetitive questioning, nor was there mention of the matter in closing argument. There simply was no additional highlighting of appellant's post-arrest silence. The constitutional error was slight and therefore, we consider the weight of the evidence in order to determine whether the error was harmless. We weigh the evidence in this second stage because even slight error cannot be said to be harmless in a case in which the question of guilt or innocence is a close one, but it can be in a case where the evidence of guilt is overwhelming. In the Harwood burglary case the evidence of guilt is overwhelming.

That evidence is that on Sunday morning, January 15, 1984, an eyewitness who was a member of appellant's family saw appellant and his wife in his wife's grandmother's 1977 Chevrolet Monte Carlo automobile with Arkansas license KWG 318, in a part of Conway County near the Harwood home. At that time Mrs. Harwood was at church and Mr. Harwood was at their farm.

After finishing his farm chores, Mr. Harwood drove home and saw an unfamiliar car in his carport. As he pulled into his driveway, the unfamiliar car came speeding out across the front yard. Harwood observed that the car was a Chevrolet or Pontiac bearing Arkansas license KWG 310, or KWG 318, with a driver and a passenger. He immediately discovered that his house had been burglarized. He called the police and gave them his observations.

A member of appellant's family testified that the appellant and his wife rushed home, hastily packed most of their belongings, got their children, and left the State in the 1977 Monte Carlo.

Subsequently, Mr. Harwood, from a mugshot, identified appellant's wife as the passenger and gave a positive in-court identification of appellant. The evidence of guilt is overwhelming. Since the evidence of guilt is overwhelming and the error was slight we can declare that the error was harmless beyond a reasonable doubt.

Affirmed.